Good morning, Your Honors. May it please the Court, my name is Gary Bostwick, and I am representing the appellants in this case. I'd like to start by trying to be of help to the Court by pointing out what I think in the record will suffice to determine the outcome with respect to our first issue. And that is the tab 11 and tab 12 of our appellant's appendix. That's pages 243 through 292, 173 through 242, plus the supplemental excerpts of record, which is 319 through 478. For some reason, some of the exhibits on Mr. MacGregor's declaration were not in the appellant's exhibit, but they are in the supplementary exhibit. If you look at the separate statement of disputed facts, and you look at the declarations of both Mr. MacGregor and Mr. Decree, the district court excluded those declarations because, he said, they were self-serving and conclusory. And that, he said, under FTC v. Publishers Clearinghouse, this Court's decision, was sufficient grounds for not accepting it in either of those declarations. And when you look at the separate statement of disputed facts, you'll see that, essentially, the evidence of the appellant's, in this case, was on the right-hand column. All the disputes were set forth, and they reflected either objections to the evidence of the FTC, or they reflected statements from the declarations. Thus, if the declarations were conclusory and self-serving, the appellants had no evidence that raised a genuine dispute of material fact. A trial judge decided that they were conclusory and self-serving, but they are not under any of the cases that are relevant for determining that kind of issue. First of all, FTC v. Publishers Clearinghouse, in that particular case, it was quite clear to anyone that there was no evidence whatsoever in the affidavits. The only attempt at trying to put in evidence was in the briefs. It was a clear-cut decision. It was easy. It was straightforward. That was simply a conclusion that had been argued in the brief, didn't have any sort of support. Now, I would admit that if we were all trying to write a declaration that we thought was better than the ones that Mr. McGregor and Mr. Dupree put in, in opposition to the motion for summary judgment, we may have been able to achieve that. That's not the test, however. And this circuit has decided on several occasions in cases that we've cited in our brief that it's not unusual that a declaration is self-serving. Self-serving doesn't really mean anything. It's unremarkable. Of course, every declaration is self-serving. That, of course, is said in the Shumway case. Also, the thing that you have to look at, is it basically simply a conclusion of law, or a conclusion based upon incompetent evidence, or something else that would make any trial judge say it's conclusory? Rodriguez had said that the self-serving declaration or affidavit is okay as long as they set forth facts based on personal knowledge, and they're not too conclusory. That's a little mysterious, but the fact is that these declarations do set forth facts. They set forth the competence of the declarants. They say, this is where I was, this is what I saw, five sense impressions, and this is what I didn't see. Now, Mr. McGregor can't say anything other than, I didn't see this, and I didn't do this, but those are statements of fact. He can say, I didn't see, but the government came forward with a lot of evidence that he should have seen. So, I mean, I suppose he can say only what he saw, but he really didn't, how did he attack the argument that it was all out there for him to see, and he either chose not to, or deliberately chose not to? That certainly was one of the problems we faced when we started looking at the record, but what you said, Your Honor, I think is very important. That is, the government had a lot of evidence, and the government's brief is full of things saying we've got a lot of evidence, but we all know that we're here on an appeal from a motion for summary judgment. Well, I mean, more specifically, they came forward that there were stacks and stacks of complaints against him, and he really doesn't have a good answer to that in his affidavit. Why didn't he take some action to deal with these incredibly large number of complaints? He fired one guy once, I guess, who deviated from his script or something, but the overall picture they paint is that they knew that there were problems, and this guy allowed them to go on for whatever reason. I know that that's the picture that is painted, and it is daunting, but the point here is that he does say we turned over the job of the actual telephone calls to third-party outsourced call centers, and we've set up everything that we possibly could to be able to do the quality control. Now, it may very well be that a jury someday will not believe that, that they will believe what you call, Your Honor, a lot of evidence that says that this is impossible. He could not have ignored all the things that did happen, but he is saying he didn't see any of it, and he did whatever he could in order to be able to try to control, by way of quality assurance, what needed to be done. And the question then is, has he raised a genuine issue of material fact? Just one. That's the annoying thing about bringing a motion for summary judgment, or for a judge who, in the judge's heart, feels that the defendant is wrong and is guilty. The problem is, however, when you're faced with that, we're all faced with Rule 56. There's a genuine issue of disputed fact that is raised by that declaration, and an overwhelming amount of evidence doesn't do any good. Didn't he just say, we have procedures in place, and what the FTC said was, we have thousands and thousands of incidents of complaints, refunds, etc., etc., and he just says, we had procedures. Well, the procedures, if they had them, obviously weren't working, and he didn't say anything about the thousands and thousands of complaints, the 40% refunds, that obviously showed that whatever procedures he claimed to have put in place, his scripts and his independent verification and the like, obviously were being ignored. But he never suggested what he did about that. He just is totally silent about that. I don't think that's correct, Your Honor, in terms of the declaration. I think if you look at it again, you'll see that he is saying that he is aware of the fact, and also Mr. Dupree says, he's aware of the fact and received the knowledge that, in fact, the outsourcing call centers and the others disciplined people who, in fact, they found to be breaking the rules. Now, one of the problems that I think we do have here, and I say we, I mean, I have, and I think the court needs to know, he didn't say, he says that errors can be made in this sort of thing. He points out in his declaration that it was only a very small percent of the number of people that were dealt with that, in fact, now comprise the complaints. And I think he concedes that it's impossible to run a completely mistake-free situation, but that he tried in every way, going back to Judge Silverman's point, tried in every way to overcome these problems by the procedures that were set up, but he admittedly wasn't there and wasn't watching and wasn't supervising those call centers. So I understand the court's problem, and I understand why the question would come, but the fact is that he, when we get to the point about whether or not this is conclusory and self-serving, throwing out those declarations entirely, it seems to me, simply under the Ninth Circuit's law, simply is not justified. Once you keep them in, then at least you have to draw all the inferences, as we know from Anderson v. Liberty Lobby, you have to draw all the inferences in the defendant's favor, in the opposition's favor, and in this particular instance, as I say, I think that the declarations could have been better, I think the evidence could have been better, I think that many things could have been done better. The fact is, as we all know, it's clear in the record that his assets were frozen, and in fact, that makes it very difficult to try to do some of the things that you might want to do, if you had all the money in the world to do it, but the point here is that there is a genuine dispute of material fact as to whether or not he was aware, or whether or not, as we've seen before, he was aware of the fact that there was a lot of personal matter involved in this case, and in fact, the state of the court said, here's a list of people we sent something to. Does that say, no, we did have the coupons, does that say we contracted with so-and-so for the coupons? It just says, we sent something to this list of people. I agree with you, Your Honor, and that's why I tried to acknowledge from the very beginning, Judge Bolton, that if you're sitting in a trial court, you want a lot more than that, there's no question about it. But, that's not what the appeal is about, it's not the issue that we raised in that sense. I believe that, in fact, this would be a very bad case to affirm on the basis of the trial judge's decision of these being conclusory and being self-serving. If this court were to weigh the evidence altogether, I think that it would be very difficult for me to be standing up here and taking this time. But, as it is, what I am trying to convince the court is that there were sufficient issues raised in the declarations, and they are not completely self-serving, even though they are not perfect. And the Ninth Circuit cases point out that declarations don't have to be absolutely correct, they just have to raise this disputed issue. I see I'm down to two minutes. I better save some of it. Thank you, Your Honor. Thank you very much. Good morning. Good morning, Your Honor. My name is Michael Bergman. I represent the Federal Trade Commission at LA in this matter. I wonder if you could pull the mic just a little closer to you, if you could. Thank you. This case is about Brian McGregor's widespread, deceptive, and abusive telemarketing scam, in which he created Continuity Partners, Membership Services Direct, and numerous other shell companies to disguise his operations and to deceive thousands of consumer victims throughout the country of more than $109 million over several years. He created several shell companies, new companies, to market the products after there were many consumer complaints that were issued and filed with the defendants, as well as when State Attorney Generals had filed suit. Now, Pellants, McGregor, and Membership Services Direct have violated the FTC and various provisions of the Telemarketing Sales Rule by making numerous, numerous misrepresentations to induce the consumers to disclose their bank account information and then engaged in various deceptive and abusive practices to enroll the consumers in purported membership discount programs, in which withdrawals were taken out of the consumer's bank accounts every month without their authorization. Now, the defendant's scheme, the hook that began the scheme, which is consistent throughout the defendants, throughout the different products, and throughout the different years here, is that they cold-called thousands of consumers all across the United States, and this is supported by the many declarations that we have in our record, as well as complaint letters, that support evidence for the same modus operandi where defendants misrepresented that they would send a valuable free item or gift, such as $200 or $500 shopping sprees or $200 gas rebate, movie passes, gift cards, discount coupons. I wonder if we could zero in on the problem here. The problem is he says he didn't do all that. Somebody else did that. What's the answer? He says he gets a trial because he came up with an affidavit that says all this bad stuff that you're telling us was done by third parties, not by him. The answer is that regardless of what he says in his declaration about the fact that he had purported policies in place, clearly the policies were not being followed. He knew over the course of a number of years that consumers, thousands of consumers were complaining. The chargeback ratios here were tremendously high. They were 58 percent in 2005. Some of the defendants had over 60 percent. So the short answer is that even if in his declaration, if he cannot defeat summary judgment merely by saying in his declaration that we had a policy in place to stop these sorts of deceptive and abusive practices, because it's clear, given the volume of material that we've submitted here in support of summary judgment, that he was aware of the massive number of complaints and did not stop those widespread deceptions. So regardless of any kind of formal policy or purported policy that he had in place, they were clearly not being followed, and he did not institute sufficient measures to stop the widespread deceptions. There are also a number of conclusory statements that are in the declaration. I mean, he says, for instance, on paragraph 54, that at no time did it appear that there was any indication that customer complaints weren't of any kind of systemic problem with any client program or campaign. In paragraph 42, he says at no time was the policy, practice, or act authorized by the companies to cause billing information to be submitted directly or indirectly without the express informed consent of the consumer. These are solely conclusory statements in which he does not support with any corroboration. Going to the issue of corroboration and when opposing counsel raised in the beginning what he was basing his opposition on and his basis here for why the summary judgment should not be affirmed, ultimately the exhibits, I think he mentioned tab 11 and 12, the exhibits to McGregor's declaration. As we've outlined in our opposition brief, none of the exhibits to the declaration defeat summary judgment. As Judge Bolton mentioned a little while ago, the evidence such as some of the exhibits that he was referring to where they sent out, where they did send out a number of products to consumers, for one thing, don't show that those consumers in fact actually ordered the products, the products being these discount membership programs. But more importantly, there is no evidence in the record, no evidence in the record that the consumers received the free upfront gift item which they were all promised for. As you've known from reviewing the record supporting summary judgment here, the consumers consistently said that they were to receive for a nominal shipping and handling fee of usually $3.95 to $4.95 a valuable free item. There is no evidence in the record that consumers in fact did get the free gift. Mr. McGregor does not state in his declaration that the promised free gifts were in fact ever sent. And except for perhaps Primetime Ventures, one of the defendants, he does not make an unqualified categorical statement in his declaration that they did not promise to send free gifts to consumers. So there is no contrary evidence to the massive consumer complaints and complaint letters that the Commission has that the consumers in fact were promised the free gift and which was a hook which they would provide their bank account information and that those free gifts were in fact ever sent. These misrepresentations were consistent, they were widespread, they were pervasive, they stretched across and consistently across the different telemarketing defendants throughout the several years in which this scam was occurring. And with regard to all the different products, and you may have seen from looking at the material, the products overlapped to a great degree. It showed that there was a, that the defendants were in fact all interrelated with Brian McGregor essentially being the ringleader behind this. It led to thousands of consumer complaints. Our database had over 2,000 complaints. There were thousands of additional non-duplicative complaints that were filed to state attorney generals, the Federal Business Bureau. The companies themselves received thousands of consumers' complaints. In fact, when the TRO was executed, it was determined that there were literally rooms full of consumer complaints in filing cabinets and the floor on top of cabinets at the premises of Merchant Risk Management, which was the management company that followed from Connect2USA. And Merchant Risk Management is a company which Brian McGregor does not dispute that he was a principal and that he was the president and had a significant role in. Most importantly, the complaints in the consumers, the complaints were that led to huge numbers of chargebacks, consumer-initiated returns, and company-generated refunds. There was no evidence at all of any satisfied customers. Mr. McGregor doesn't attach to his declaration a single declaration from a single consumer, indicating that the consumer was in fact satisfied that actually got what he thought he was getting. Instead, he sends out, as Judge Bolton referenced, a huge list of products that were sent. These were, again, the underlying program memberships. And as we've said, these were — it's unclear whether the consumers even asked for these program memberships. And these were also separate from the free gift, which was a hook, which was the reason why consumers initially gave their bank account information. Mr. Bergman, was there some evidence that Mr. McGregor was told about all these things that were going on, the complaints that were being made? Did the FTC say, we've looked into this, and what have you got to say about this? There is little doubt that Mr. McGregor had great knowledge of this. And how was that established? That's established, Your Honor, through — for one thing, he states in his declaration that he was aware of a high decline rate. Again, the decline rate is essentially consumers that are complaining with their pocketbook. He said 30 to 40 percent in his declaration. In fact, it was even higher. He said 58 percent in 2005, and some of the defendants are even higher. That is the most direct way that consumers can complain, is through their pocketbook. He also — we have in the second SMART declaration, supporting the preliminary injunction motion, showed that there were literally file cabinets and rooms full — file cabinets full of complaints at the premises of Merchant Risk Management. And Mr. McGregor, we've stated in our brief, was the principal and was the key operator at Merchant Risk Management. The complaints went to his company. Went to his company. He's there. They came there on, I think, February 22, 2006. And he's the principal at Merchant Risk Management, and there are complaints literally falling out of file cabinets. Again, he also admits that the companies paid out millions of dollars in refunds. There were also several Assurances of Voluntary Compliances, which were filed against CPI. There were actually three that were filed. There was the State of Oregon, the State of Iowa, and the State of Pennsylvania all filed and actually had signed Assurances of Voluntary Compliance that were signed by Brian McGregor, in which Brian McGregor obviously knew of the level of — that states were concerned about the complaints here. And he was actually under order at that point not to violate those AVCs. That would lead to contempt of civil penalties. There were also two separate complaints that were filed by Wisconsin and Ohio. So the evidence is really overwhelming that Brian McGregor was aware of the volume of complaints that knew that the customers were complaining primarily about the fact that they never got this upfront free item and that they were basically hooked by giving their bank account information into getting into these membership programs in which their bank accounts were being withdrawn every month. And then they would try to cancel it, and they couldn't cancel. They couldn't cancel during the free — the purported free seven- or ten-day trial period. They couldn't cancel after the trial period ended. Often, consumers would find that after a period of months that they would be paying for these program memberships, which they never intended to get. I wonder if I could ask you a question about the terms of the injunction itself. Sure. I have two in mind in particular. One says he's not to violate the telemarketing sales rule again in the future. Right. And the other one, he's not to make any misrepresentations in the future. Right. Are those overbroad under our standard oil precedents? We don't believe so. I mean, in this case, the injunctive provisions are permissible if they're reasonably related to what the underlying deception was. In this case, the overwhelming evidence is that Brian McGregor deceived consumers in a vast, broad telemarketing scam, which violated the telemarketing sales rule. So, therefore, we would say that the injunction against violating the telemarketing sales rule is completely permissible because there's vast evidence that he, in fact, violated the telemarketing sales rule. And the misrepresentations were related to the deception. But it's not limited to telemarketing, I gather. The don't make any misrepresentations in the future could mean anything, isn't it? It could cover anything. It would cover if he sells used cars, if he – Again, given the scope on how egregious his telemarketing scam is, that even that injunctive provision should be upheld because he clearly was engaged in a massive fraud. So even though it's beyond those particular misrepresentations, that would cover misrepresentations beyond telemarketing that's permissible, given how vast the telemarketing scam is involved here. What's your best case for the proposition that an injunctive term is the one I've just described, no misrepresentations, period, not limited to telemarketing or the scheme, that a provision that broad would be valid? Do you have a case that you could cite us to? I have two. One second, Your Honor. I apologize for the delay. I would say the Colgate-Palmolive case is our best. It's our best case on that point, given, again, that whatever the injunctive provisions are reasonably related to the unlawful practices which were found to exist. Did you recall what the terms were in Colgate-Palmolive? I do not, Your Honor. I guess asking Judge Silverman's question in another way, why isn't it sufficient to simply bar Mr. McGregor from ever involving himself in telemarketing sales again? Well, we also think that he should be barred from selling any kind of program memberships as well, since the program memberships were the underlying sales. And we might try to go into a business that did it other than by telemarketing. Absolutely. I mean, the cases fairly consistently state that various factors that you look into, again, this comes from, I believe, the Standard Oil case and the Litton case, are to look to see the respondents that have acted in blatant disregard of the law, whether they had a history of engaging in unfair trade practices, whether the deceptive conduct can be transferred to another product, the extensiveness of the fraudulent telemarketing, the failure of prior law enforcement efforts to stop unlawful activity and the likelihood of future violations. It's very important that the injunctive provision, given how vast and egregious the telemarketing scandal here, extends to at least selling program memberships, which was the underlying scheme which he was engaged in here. And the injunctive provision with regard to all telemarketing is, again, is completely valid given the egregiousness of the telemarketing scandal here. Thank you, Mr. Berkman. Mr. Boswick, you get the last word. Thank you, Your Honor. As to the monetary remedy, I just want to leave it to the briefs. I think we've covered it sufficiently there. I'm not going to go into that. I just didn't want the court to think that we were – didn't think it was important simply because we didn't argue it. I heard several words, again, in the argument, in the governance argument, that I heard and saw in the brief once again that I think are just irrelevant. I heard overwhelming twice. I heard inferences. I heard volume of evidence. I understand what he's trying to say. And if I were facing a trial, I'd be concerned about that. But that's not the point on the motion for summary judgment. I just want to reiterate what I already argued before. Now, as to the connection with Merchant Risk Management, Ryan McGregor did talk about that at paragraphs 41 and 46 of his declaration. And he said that they were involved in trying to make whatever corrections needed to be made from a quality assurance point of view and that he was only involved in that at the end. And he did not believe that he was, in fact, a principal thereof. Starting at page 10 of our reply brief, we have the entire list of reasons why I think, going to Judge Silverman's point before, that McGregor has raised at least an issue as to whether he participated directly or had authority to control, which are the magic phrases for whether or not, in fact, the motion for summary judgment should have been granted. Then when it comes later down the line in terms of whether or not he had apparent authority, apparent authority has never been enough under any cases that have been cited for making a person liable. And finally, we have the argument that he simply did not have the state of mind to order the remedy against him as an individual. That's covered in our briefs. And I think I've run it right down to the end. You did. Thank you, Your Honor. Thank you, too, Mr. Bergen. The case is just argued and submitted, and we'll stand recess for the morning. Thank you, Your Honor. Thank you.
judges: Bolton, Thompson, Silverman